### State of Vermont v. Fay M. Anderson, Jr.

(125 A2d 827)

May Term, 1956.

Present: **Jeffords, C. J., Cleary, Adams and Hulburd, JJ. and Sylvester, Supr. J.**

Opinion Filed October 2, 1956.

*Asa S. Bloomer* for the respondent.

*Earle J. Bishop,* State's Attorney, *Robert T. Stafford,* Attorney General, and *Frederick M. Reed,* Deputy Attorney General for the State.

**Hulburd, J.** The respondent, Fay M. Anderson, Jr., was charged with the crime of burglary in the nighttime by breaking and entering the summer home of one John H. MacLeod in Wallingford, Vermont. Just prior to trial, the State, having first obtained leave of the court, amended the information by correcting the name of the owner of the house alleged to have been broken into, by striking out the words, "John H. MacLeod" and inserting in lieu thereof, the words Caro MacLeod. This amendment, however, was not verified and did not state that it was made by the State's Attorney upon his oath of office. No objection was made at the time on this account. Instead the respondent waived his statutory right to twenty-four hours in which to plead and pleaded to the information as amended. Thereafter the trial proceeded to verdict without any claim on the respondent's part that the information was wanting in any particular. After the jury had returned a verdict of "guilty", the respondent in a motion to set it aside, raised the question in this regard for the first time. The trial court declined to set the verdict aside and the respondent was allowed an exception.

This is not a case in which the original information was brought unverified and not upon the State's Attorney's

oath of office. Such an information would have been void in view of Art. 11, Chap. 1 of the State Constitution. *State* v. *Bruce*, 68 Vt 183, 186, 34 A 701. *State* v. *Donaldson*, 101 Vt 483, 486, 144 A 684, and see *State* v. *Harre*, 109 Vt 217, 195 A 244. Here the respondent was properly in Court under a proper information. Having pleaded to the amended information, he went to trial without objection. After conviction, he complains for the first time that although the original information was verified, the amendment was not in the same form. The respondent relies upon *Hazelton* v. *State*, 8 Okl Cr 184, 126 P 703. The Oklahoma constitution has a provision requiring verification of informations similar to ours. An examination of this case shows that the defendant promptly objected to the unverified amendment and refused to plead. The trial court entered a plea of not guilty for the defendant and proceeded to try the defendant despite his objections and exceptions. It was held that it was error to proceed without verification in the face of the defendant's timely objection. In reaching its decision the court pointed out that the defendant had not waived his objection. The court made it equally clear that such an objection could be waived. This is the law not only in Oklahoma but generally. See *Ex Parte Talley*, 8 Okl Cr. 186 ,112 P 36, 31 LRANS 805. By pleading and going to trial without raising the question, the respondent waived his right to urge it thereafter. V. S. 47, §2399 provides to the same effect as follows: "Objections to a complaint, information, or indictment, for a formal defect apparent upon the face thereof, shall be taken by demurrer or motion to quash, before the jury is sworn. The court may cause the complaint, information or indictment to be amended forthwith in such particular by some officer of the court." *State* v. *Freeman*, 59 Vt 661, 663, 10 A 752, was decided with reference to the foregoing statute and is clearly consistent with our holding here. This ground of the respondent's motion to set the verdict aside is of no avail to him.

But there was a second ground to his motion. It was "that the jury was not kept together, the respondent having requested that the jury be kept together after the jury was sworn in; having taken an oath to that effect, the respondent

at no time waiving any rights he had to the keeping together of said jury."

There is no question on the record but that the respondent, following the swearing of the jury, upon being inquired of by the court, requested that they be kept together and that in the face of this request, the court, purporting to exercise its discretion, expressly permitted the jurors to separate and return to their homes from day to day throughout the trial, [and over the Christmas holidays], from December 20th to December 28th, on which latter day the case was submitted to the jury for decision. The respondent duly excepted to the court's action in these words: "We would take an exception on the grounds as a matter of law and also an abuse of discretion, this being a felony".

The record shows that at the time permission was given to separate, the jury was admonished against external influences and discussion of the case with outsiders. No claim is made of any lapse on the jury's part in this regard.

In support of his position, the respondent cites *State* v. *Shippy*, (1817) Brayton 169, wherein it is said, "on an indictment for perjury the verdict was set aside on the ground that one of the jurors had separated from his fellows (unattended by an officer) after he was sworn and before verdict." No circumstances or reasons appear in this decision. *State* v. *Godfrey*, (1817) Brayton 170 is to the same effect although that was a capital case.

The State has cited but one other Vermont authority bearing on this subject, namely, *State* v. *Lawrence*, 70 Vt 524, 529, 41 A 1027. In that case (one of felonious assault) the jury, accompained by the officer in charge, attended a church service in a body. One of the jurymen became suddenly ill so that it was necessary for him to leave the church, the officer consenting, supposing he would directly return. The separation lasted from twenty to twenty-seven minutes during which the absent juror had no communication with anyone. The refusal of the trial court to set the verdict aside was sustained.

In the course of the opinion the Court said at page 530: "In the case of misdemeanors, it is generally conceded in

England and in this country, that the courts have the same discretion as in civil cases as to permitting the jury to separate before the case is submitted to them by the charge of the court. In this state, the practice has been in cases of misdemeanors, to permit the jury, in the discretion of the court, to separate, while in the case of felonies not capital, the practice has not been uniform in respect to permitting the jury to separate after they were sworn for the case, *when the respondent consented to such separation*, (emphasis supplied). In capital cases, no separation has been allowed."

Since the case was one of temporary separation merely, the court goes on to say at page 531: "It is not necessary to decide whether the court has the discretionary power in criminal trials for felonies not capital, to permit the jury to separate before the case is submitted to them". The question we have before us, therefore, was left undecided by the court in *State* v. *Lawrence, supra*.

The State in its brief says it has found no statutory authority in Vermont relating to the matter of jury confinement during a trial. It contends that the majority of the cases in other jurisdictions hold it to be a matter of discretion in the court as to whether to permit a separation of the jury after it is sworn in non-capital felony trials. Thus the State bases its case on authority generally, referring particularly to the note in 34 ALR 1130 and to 53 Am Jur p. 629 et seq. A similar discussion may be found in 23 CJS at pages 1014-1020. The state contends that since the trial judge's discretionary ruling was in line with the majority rule as disclosed by these authorities, and since no prejudice has been shown, no error has been made to appear.

Upon examining the cases in which separation of the jury has been held to be discretionary with the Court, we find that they fall roughly into three classes. There are those states in which this common law rule that juries may not separate in felony cases, has been expressly done away with by outright statutory provisions. Secondly, there are other jurisdictions where the courts have reached the same result because of some statutory implication, such as is found in a

provision that the court shall admonish the jury before allowing it to separate. Finally there are those jurisdictions in which the statutes are entirely silent on the matter. Even in this latter group, some courts have got away from the common law rule and hold that separation is permissible in the court's discretion although many hold to the contrary.

The case before us does not fall within any of these three groups. In Vermont, separation is not expressly allowed by statute, nor is it implied. The statutory implication is, indeed, the other way. It is because of this that we do not fall within any of the three groups mentioned. We find no case which goes so far as to hold that the court may exercise such a discretion in the face of a statutory implication against separation.

When we turn to V. S. 47, §10,611, Forms 6 and 7, we find the oaths to be administered to the officer taking charge of the jury in county court. Form 6 is general. It applies for the whole term of court, and it binds the officer, among other things, to keep the jury together "after they have been charged by the court." Form 7, on the other hand, is more specific and goes farther. It is for criminal cases only. It reads: "You solemnly swear that you will keep together the persons comprising this jury during any recess of the court, until they return into court, and that, in the meantime, you will suffer no person to speak to them, or speak to them yourself, concerning the cause on trial or any matter thereto relating."

The foregoing oath came into our statutory law in connection with the 1839 revision. As originally enacted it read just as it does today except that the words "during any recess of the court" were not initially included in the oath although the title to the original statute stated it to be "Oath to be administered to an officer taking charge of a jury in a criminal cause *during a recess* (emphasis supplied) of the court and before the jury are charged." By No. 42 of the Acts of 1890 the words "during any recess of the court" were brought into the oath itself so that it read as at present. The amendment changed the oath in no other respect. The fact that the legislature felt the necessity of passing an amendatory act for the sole purpose of getting into the oath some-

thing which had previously been only a part of the title to the act is a clear indication of the legislature's intent and the significance it attached to it. So it is not surprising to find in Harman's "Manual of Vermont Court Procedure" the following in Par. 701 "In a criminal cause the juries do not have a written verdict, and, of course, cannot seal it up. Except in trials for minor crimes, they are kept in charge of an officer, *from the beginning of the trial to its end*. (Emphasis supplied). They eat, sleep, and walk out together; they read only such literature as the officer permits. Every care is taken to exclude from their minds all information about the cause on trial except what the court room gives them."

After examining a great many cases we have found none in which the court was willing to act contrary to a statutory implication, and hold that it had discretionary power to permit the jurors to separate and disperse from day to day during the trial. We cannot say here that the statutes are entirely silent as to procedure on this point. The fair implication is against allowing dispersion of the jury. As was said in dealing with this problem in *Faulkner* v. *State*, 193 Ind 663,669, 141 NE 514. * * * "We are not authorized to change a rule which has been generally recognized as an absolute rule of law governing the rights of a defendant in a criminal cause."

■ Some jurisdictions go so far as to say that a respondent may not even waive his right to have the jury kept together. See 23 CJS p. 1066; and note on this point *State* v. *Lawrence*, 70 Vt 524, 530, 41 A 1027 as quoted above. We think, however, that the better rule, and the one which is consistent with our practice is to the contrary. We hold that a complete dispersion of the jury in a case of felony, in which the jurors are permitted by the court to pass from under the eye of the officer having them in charge, the respondent not having consented thereto, is improper. It follows, therefore, that the exception to the denial of the motion to set aside the verdict must be sustained. The case must be remanded in order that it may be retried.

In view of the foregoing determination, we would not

ordinarily be under a necessity to pass upon the remaining exceptions. However, since they raise questions of unusual interest and importance which are likely to come up again, we feel that some consideration of the other points concerned is desirable. For a proper understanding of what is involved, a brief review of the course of the trial and some of the evidence is necessary.

At the outset of the trial counsel for the respondent gave notice of his defense, pursuant to V. S. 47, §2400, stating that he would rely "among other things on mental incapacity or insanity." It is to be noted that the statute uses the word insanity only and says nothing at all about mental incapacity. Having so forewarned the State, the respondent brought out in evidence the following facts. The respondent is a man about thirty-two years of age. When he was eight years old he had the misfortune of being injured in an automobile accident. At the time he suffered a head injury and was rendered unconscious for several days. Following that he was not alert or active and his memory seemed impaired. He soon gave up school although a kind neighbor gave him some private instruction. When he was about fifteen he accidentally shot himself in the hand. He had a similar accident fifteen years later. At times the respondent was unruly; at times he avoided people. On some occasions he became violent and threw things and damaged property, and at times he had "black outs". These events seemed to have occurred for the most part in his early years. Later in 1942 the respondent went into the army and spent some time there.

In September, 1950, he was committed to the Vermont State Hospital at Waterbury, apparently under a temporary order of removal. Thereafter, on November 17, 1950, he was adjudged insane and dangerous and he continued at the State Hospital under a new order of commitment issued on that date. At that time he was reported by the Superintendent to be insane. By April 7, 1951 his condition had improved and he was released.

It was brought out by the State, in rebuttal, that at the time of his release (April 7, 1951), the respondent was sane

in the opinion of the Hospital's Superintendent, Dr. Chittick; that at that time he knew right from wrong, and could control his impulses to commit wrongful acts. In the spring of 1952 the respondent was again sent to the State Hospital for observation by the Rutland Municipal Court. Following examinations made at that time, it was the Superintendent's opinion that the respondent was then sane. This was May 1, 1952. The Superintendent next saw him in April, 1954, when the respondent was committed to the State Hospital by the Rutland County Court for an opinion as to the respondent's sanity relating to the present prosecution. At this time the Superintendent was assisted in making a diagnosis by Dr. Forrest, a member of the Hospital's staff. The respondent was observed for a period of six months and tested and examined at length. As a result of this observation and examination Superintendent Chittick and Dr. Forrest both were of the opinion that on the date of the alleged crime the respondent was sane and that he knew right from wrong and that he had the power to control his impulses to perform wrongful acts. There was also lay testimony of those who saw the respondent at or about the time of the crime from which a similar inference might be drawn. In connection with these opinions a great deal of the respondent's history was brought out both by the State and the respondent: how Anderson got along at work, his vulnerability to intoxicating liquor, his general characteristics and the fact that he was in no serious trouble before coming out of the army. There was a great mass of evidence giving his physical history prior to the date of the alleged crime; the fact that he had headaches, insomnia and other symptoms which might be referable to the accident he had earlier in his life.

Counsel for the respondent calls our particular attention to that portion of the evidence bearing on the respondent's mental ability. It appeared in evidence that respondent was a border line case of high grade moron with the attributes of intelligence of a boy nine to ten years old. Counsel for the respondent on re-cross examination drew from Dr. Forrest, medical witness for the State, the following:

Q. You say a moron has the ability to determine between right and wrong, if he is a low grade moron of the mentality of about 8, that means he can tell the difference between the right and wrong of an 8 year old child, isn't that what that means?

A. It can be compared like that, yes.

Q. If he is a medium grade moron, he can tell the difference governing his conduct by what a 9 to 10 year old child would do?

A. More or less.

Q. If he is a high grade moron, he could govern his conduct by what a 10 to 11 year old would do?

A. Yes, we do use those terms.

Q. That would be the scale he is able to tell what was right or wrong, wouldn't it?

A. Yes.

Q. And that would be the scale of his ability to resist the impulses of some older person?

A. Well he can use it that way too. (Transc. says "he"; probably *we*.)

Q. That is, some women we will say over or about fifty, under very ordinary circumstances would have some influence on a lad of 8 or 9 years old?

A. Yes.

Q. Easily led, I think is one of the notions you had, one of the conclusions you drew with reference to Fay Anderson?

A. Yes.

We have stated, we think, a sufficient part of the testimony to show the bearing of the respondent's remaining exceptions. All of them were taken in connection with the court's instructions to the jury. We would like first to mention the exception stated below since it leads into a consideration of the other exceptions taken:

"The respondent also desires to raise the question of the jurisdiction of the Court as compared to the juvenile court and save exceptions in connection therewith; we state that because we again say that this is a novel situation and the undisputed evidence shows the mentality of a juvenile."

■ This exception discloses the basic contention of counsel for the respondent, a contention which runs all the way through his argument, namely, that since the tests showed that the respondent's intelligence to be that of a ten year old child, the law should deal with him as such. Apparently counsel for the respondent by his exception was putting forward the claim that the only place the respondent might be properly tried was in juvenile court. If counsel seriously entertained this view, he has abandoned it by failing to brief his exception. *In re Chisholm's Will,* 93 Vt 453, 457, 108 A 393.

■ The same underlying thought, however, appears in another form. The respondent excepted to the "court's failure to charge the law with respect to presumption going with a mentality of that age." Here again counsel for the respondent has his eye fixed not on Anderson's actual age but on his "mental age" and counsel argues that since Anderson has the mentality of a child of ten, the common law presumptions as to a child's incapacity to commit a crime should apply and that the court should have called "this very subject matter to the attention of the jury and by proper instructions acquaint them with the law having to do with the presumption that Fay Anderson was incapable of committing the crime alleged, unless the State establish facts to show otherwise." Counsel cites *State* v. *Kelsie* (1919) 93 Vt 450, 108 A 391, where this Court said at page 452:

"He was allowed to give and did give during his examinaton and cross-examination a very clear, comprehensive and intelligent account of the various tests that were applied to the accused to determine his physical condition and his mental development, together with his responses and reactions, and from it all gave his conclusion that the accused was mentally and morally an eight year old boy. The pur-

pose of this evidence is apparent. At common law an infant under the age of seven years was conclusively presumed to be incapable of committing a crime. Between seven and fourteen, he was presumed to be incapable, but the fact might be shown otherwise. Above fourteen he was presumed to be capable but this presumption was rebuttable. So if common law rules ware to be applied, the respondent had, by this evidence, if believed, raised a presumption of his incapacity and had made a jury question of it." In effect, counsel for the respondent would have this Court create a presumption with respect to adults who are mentally deficient which would be analagous to the common law presumptions applicable to infants and their capacity to commit crime. Not only would counsel have the presumption created but he would have had the court below in its instructions "acquaint" the jury with it. To have done so would have meant ignoring the nature of a presumption. Assuming for the moment that such a presumption was available to the respondent, it disappeared upon the introduction of evidence by the State tending to show that in fact the respondent did have the requisite capacity to commit crime. *Tyrrell* v. *Prudential Ins. Co.* (1937), 109 Vt 6, 23, 192 A 184, 192, 115 ALR 392; *State* v. *Lizotte* (1938), 109 Vt 378, 387, 197 A 396. Since a presumption has no probative value it was not for consideration by the jury. Presumptions supply the place of facts. When evidence is produced which is contrary to the presumption, the presumption vanishes entirely. In view of the testimony of Dr. Chittick and Dr. Forrest and other evidence in the case, any presumption, which we assume may have existed, disappeared and the court properly refrained from instructing the jury along the lines urged by counsel for the respondent.

The record shows a further exception as follows: "The respondent also excepts to the court's failure to charge. what the mental capacity of a nine year or ten year old person is in connection with the act complained of." Here again counsel for the respondent persists in identifying the accused with a ten year old person. Unlike the other exceptions, however, it can not be said that this one fairly directed the attention of the court to any claimed error.

Having correctly charged the law of *State* v. *Kelsie,* 93 Vt 450, 108 A 391, *supra,* the court was entitled to know what was being excepted to and why it was being excepted to. *Hall* v. *Royce,* 109 Vt 99, 107, 192 A 193. If there was a shortage in the court's charge it should have been pointed out in such a manner that the court might have had an opportunity to amplify its charge accordingly. *In re Chisholm's Will,* 93 Vt 453, 456, 108 A 393. The exception did not meet the test of our cases and, therefore, is not for our consideration beyond what has already been said in connection with the other exceptions. It is too late now for counsel to expand the exception into something not fairly and reasonably apparent in it at the time it was taken. *State* v. *Graves,* 119 Vt 205, 122 A2d 840, 846.

But one exception remains to be considered. It pertains to the following portion of the court's charge: "The law does not require that each particular fact which may aid the jury in determining that the respondent is guilty as charged, shall be proven beyond a reasonable doubt; the doubt which would justify an acquittal is not a doubt of any particular fact; *** it must be a doubt of all the incriminating facts. * * *" Counsel for the respondent says that "the entire theory of reasonable doubt has been shaken by such a statement in the charge." He says that if the proof fails to establish *any* of the essential elements necessary to constitute a crime the defendant is entitled to an acquittal. With this latter statement the State agrees. And so, in fact, did the charge itself. Just previous to the statement complained of, and while dealing with this very subject, the court stated: "The burden is upon the State to make out and establish all the essential elements of the charge against the respondent, beyond a reasonable doubt."

Actually the court is here reiterating a thought put before the jury almost at the outset of its instructions. Considering the charge in its entirety, and not piecemeal, we are satisfied, that it put before the jury a fair statement of the law. Compare *State* v. *Orlandi,* 106 Vt 165, 176, 170 A 908; *State* v. *Bolton,* 92 Vt 157, 161, 102 A 489. We do think that care should be taken by a trial court in instructing a jury on this aspect of a case so that the jury may be able to differen-

tiate between "essential elements" and "particular incriminating facts." The instruction taken as a whole should not be confusing; for if this were so the respondent might justly complain.

*For reasons stated earlier in the opinion, judgment is reversed, verdict set aside and cause remanded.*