579 F.2d 141
 Scott David DUNKERLEY, Petitioner-Appellant,
v.
Cornelius HOGAN, in his official capacity as Commissioner of
Corrections for the State of Vermont, and Richard Bashaw, in
his official capacity as Superintendent of the St. Albans
Correctional Center, Respondents-Appellees.
 No. 608, Docket 77-2138.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 17, 1978.
Decided June 5, 1978.
As Amended June 28, 1978.
 
 James L. Morse, Defender General, State of Vermont, Montpelier, Vt., for petitioner-appellant.
 John C. Everett, Jr., St. Johnsbury, Vt. (Dale O. Gray, State's Atty., for Caledonia County, St. Johnsbury, Vt., of counsel), for respondents-appellees.
 Before MOORE, SMITH and MANSFIELD, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 The central issue on this appeal from the denial by the District of Vermont, Albert W. Coffrin, Judge, of a writ of habeas corpus is whether the retrial of petitioner-appellant, following a state trial judge's Sua sponte declaration of a mistrial over petitioner's objection would violate his Fifth Amendment right to be protected against double jeopardy. We hold that it would and reverse the denial of appellant's petition.
 
 
 2
 The facts are simple and straightforward. On October 13, 1976, the trial of appellant for the first-degree murder of his stepfather began in the Orleans Superior Court, Vermont, before Judge Silvio Valente and a sequestered jury. It was undisputed that appellant had on April 6, 1976, shot and killed his stepfather. The defense was insanity or, in the alternative, diminished capacity arising out of family stress, appellant's pathological dependence on his mother and other causes.
 
 
 3
 During the first two days of trial the jury heard three witnesses, the most important of whom was appellant's mother, Sandra Downer. She first described the immediate circumstances of the shooting, which occurred in an isolated trailer-home in northern Vermont where three poverty-stricken unemployed people (mother, son and stepfather) lived during the winter in a state of semi-confinement and tension, with the stepfather evidencing a dislike for the stepson. On direct and cross-examination Mrs. Downer gave in detail a lengthy and sympathetic account of appellant's background, beginning with his harrowing experiences as a child. According to his mother, appellant had frequently been brutally beaten and mistreated as a child by his real father, an alcoholic, with the result that appellant often suffered bleeding from the ears and hardness of hearing. She testified that her son had been withdrawn as a child, isolating himself from contact with other children. He had a chronic stutter, and had to be fed occasionally by his mother until he was nearly 12 years old. This situation did not improve with the mother's second marriage, this time to another alcoholic, which resulted in a second divorce. In the meantime appellant got into trouble in his early teens, and was confined in state reformatories twice for a total of nearly two years. His mother married for a third time, but this marriage also proved to be an unhappy one, resulting in beating of the mother by her third husband, the eventual victim of the homicide, for which appellant was indicted and brought to trial.
 
 
 4
 The mother further testified that at her invitation and with her husband's consent appellant moved in with the mother and stepfather. Fights between appellant and stepfather developed and on occasion appellant would evince peculiar expressions or mannerisms. The son, according to his mother's testimony, suffered from "dreams and fantasies" and on the night of the homicide "didn't know what he was doing." Shortly prior to the homicide the mother and stepfather had an argument in the trailer in appellant's presence about allowing the mother to telephone her daughter, which ended with the mother stating that she and her son should go somewhere else where no one would tell her what to do. Shortly thereafter, the stepfather telephoned the police, reporting that he wanted appellant "out of the house." The shooting occurred a few moments later.
 
 
 5
 On the morning of the third day of trial appellant was hospitalized with a 15% Collapsed lung. Three doctors, including one appointed by the court, concurred in the view that hospitalization would be required for a period of from 7 to 10 days, a prognosis that turned out to be correct.[1] Confronted with this development, the trial judge asked for the views of counsel as to whether a mistrial should be declared. Appellant's attorney strongly opposed a mistrial on the grounds that the delay and second trial would be an "enormous psychological hardship" on Dunkerley and his mother, and would subject him to double jeopardy. It was later disclosed that appellant was satisfied with the testimony that had been given by the mother and that "in the opinion of the defense the trial was going particularly well for the defendant." Defense counsel suggested that in lieu of being subjected to repetition of the trauma already experienced his client would be prepared to waive presence at the trial during the period of hospitalization pursuant to Rule 43(b), Vt.Rules of Crim.Procedure.[2]
 
 
 6
 The defendant's suggestion was vigorously opposed by the prosecutor who stated that "under no circumstances" would the State proceed without the defendant being present and suggested that the defendant's absence in the hospital could not be treated as "voluntary" within the meaning of Rule 43(b) (1), Vt.Rules of Crim.Procedure, so that the trial could not proceed without him. Thereupon defendant's counsel suggested as an alternative that the jury, with his client's consent, be de-sequestered, which would permit it to go home, and that trial be suspended for the 7 to 10-day period during which the defendant would be confined to the hospital, following which trial could be resumed or the situation reviewed to determine whether a mistrial would be appropriate. The prosecutor, although refusing to move for a mistrial, took no position with respect to this proposal but suggested that the trial judge might declare a mistrial because "Jeopardy is not effected (sic) by the Court on its own motion declaring a mistrial."[3] The defense, on the other hand, stated that "if he (Dunkerley) is able to come back 7 to 10 days that would not be an undue delay and our position is that he has been placed in jeopardy here and that any subsequent trial would be double jeopardy."
 
 
 7
 The trial judge, after a 10-minute recess, announced that "the Court of its own motion is going to declare a mistrial," to which the defendant's attorney objected. The jury was called in, advised of the court's action and discharged. The only reason given by the court for its action was a general statement that "in order to insure a fair trial for the defendant here, . . . the Court felt in the interest of justice that a mistrial should be declared." Judge Valente also stated that he had taken into consideration the fact that it would not be a very lengthy trial and advised the jury "I don't think I have any alternative to fairness to both the respondent and the State. I have to declare a mistrial." No mention was made by the Court of the alternative of a continuance, which had been proposed by appellant's counsel and not objected to by the prosecutor. Nor was any reason given for rejecting that alternative.
 
 
 8
 Dunkerley next moved to dismiss the indictment against him on double jeopardy grounds, which was denied. When the Vermont Supreme Court denied him leave to file an interlocutory appeal, he filed a petition for habeas corpus in the Chittenden Superior Court, which was denied, then he appealed that decision to the Vermont Supreme Court, which affirmed the denial of the writ in an opinion dated June 7, 1977. In re Dunkerley, 376 A.2d 43 (Vt.S.Ct.1977). The Vermont Supreme Court held that the defendant's absence from trial was not voluntary and that the trial court could not exercise its power under Vt.Rules Crim.Procedure 43(b) to conduct the trial during his absence, but that, assuming the defendant could waive his constitutional right to be present, the trial court had acted within its discretion in refusing to continue without Dunkerley since the defense was insanity and "the jury's observation and evaluation of him with respect to his mental condition" was a factor that might be taken into account by the jury. The court did not discuss the question of whether, in lieu of a mistrial, Judge Valente should have suspended trial for 7 to 10 days until Dunkerley was released from the hospital and could be present.
 
 
 9
 Having exhausted his state remedies, Dunkerley then petitioned the federal district court for the District of Vermont for habeas corpus. On October 13, 1977, Judge Coffrin, dismissing the petition, concluded that since the trial judge had been made aware of all the circumstances, including the alternatives to a mistrial, and neither the prosecution nor a government witness was the chief cause of the interruption of the trial, the declaration of a mistrial was not clearly erroneous or an abuse of discretion. He further held that Vt.R.Cr.P. 43(b)(1) merely allowed the court to continue with a trial in the defendant's absence under certain circumstances and "does not give a defendant the right to have his trial proceed without him." Finally, Judge Coffrin concluded that the defendant's right to waive confrontation of witnesses did not carry with it the right to insist on the trial proceeding without him. From this dismissal Dunkerley appeals.
 
 DISCUSSION
 
 10
 The general principles by which we are governed, in determining whether retrial following declaration of a mistrial over a defendant's objection would violate his Fifth Amendment right[4] to be protected against double jeopardy, are well settled. Once jeopardy has attached, the defendant has a "valued right to have his trial completed by a particular tribunal," Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed. 974 (1949) (quoted with approval by the Supreme Court in United States v. Jorn, 400 U.S. 470, 484, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971), Illinois v. Somerville, 410 U.S. 458, 466, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973), and Arizona v. Washington, --- U.S. ----, ----, 98 S.Ct. 824, 829, 54 L.Ed.2d 717 (1978)). The purpose of the Double Jeopardy Clause is not merely to insure against harassment of an accused through repeated efforts by the Government to obtain a conviction after an acquittal, but also to protect the defendant against continued exposure to anxiety, embarrassment, expense and restrictions on his liberty that might be caused by aborting one trial to commence another.
 
 
 11
 "Even if the first trial is not completed, a second prosecution may be grossly unfair. It increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted. The danger of such unfairness to the defendant exists whenever a trial is aborted before it is completed. Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial." (Footnotes omitted). Arizona v. Washington, --- U.S. at ----, 98 S.Ct. at 829 (1978).
 
 
 12
 Against the defendant's right to have his trial completed before a particular tribunal there must be balanced the public interest in insuring that the prosecutor be accorded one full opportunity to present his case against the accused and that both sides receive a fundamentally fair trial. Recognizing this, the Supreme Court, in an early landmark decision by Mr. Justice Story, held that a trial court may discharge a jury without precluding a new trial when, after "taking all of the circumstances into consideration" and exercising "sound discretion", it determines "that there is a manifest necessity for the act (declaration of mistrial), or the ends of justice would otherwise be defeated." United States v. Perez, 9 Wheat. (22 U.S.) 579, 6 L.Ed. 165 (1824).
 
 
 13
 The types of situation that might constitute "manifest necessity" or defeat "the ends of justice" unless a mistrial is declared are obviously too many and varied to be catalogued or to permit establishment of precise formulas or rigid rules of thumb. A great deal of discretion must therefore be vested in the trial judge, who is usually best situated to determine the degree of necessity for the declaration of a mistrial when an unexpected event occurs during a trial. For these reasons "we accord the highest degree of respect to the trial judge's evaluation," Arizona v. Washington, 98 S.Ct. at 833 (1978).
 
 
 14
 On the other hand, from the outset the Supreme Court has cautioned that "the power (to declare a mistrial) ought to be used with the greatest caution under urgent circumstances, and for very plain and obvious causes," United States v. Perez, 9 Wheat. (22 U.S.) at 579. More recently, the Court has construed "manifest necessity" as meaning a "high degree" of necessity "before concluding that a mistrial is appropriate," Arizona v. Washington, --- U.S. at ----, 98 S.Ct. at 831 (1978), and has warned that
 
 
 15
 "(I)n view of the importance of the right (to have the trial concluded by a particular tribunal) and the fact that it is frustrated by any mistrial, the prosecutor must shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar. His burden is a heavy one. The prosecutor must demonstrate 'manifest necessity' for any mistrial declared over the objection of the defendant." (Footnote omitted). 98 S.Ct. at 830.
 
 
 16
 Although findings of fact or a statement of the trial court's reasons for the declaration of a mistrial are not constitutionally mandated, the failure of the record to provide adequate support for the trial judge's action may bar a retrial.
 
 
 17
 It is not enough that plausible reasons might conceivably exist for the trial judge's action. If we are to review his exercise of discretion, to which deference should ordinarily be accorded, we must know the basis for that decision as "disclosed by the record," including "argument of counsel prior to the judge's ruling." Id., 98 S.Ct. at 836.[5] For instance, a retrial has been barred by the Double Jeopardy Clause where the record revealed that a mistrial was declared (1) to permit the Government to make further efforts to secure the presence of a key witness who had not been subpoenaed prior to commencement of trial, Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963); (2) because the trial judge believed that government witnesses had not been adequately warned of their Fifth Amendment rights, United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); or (3) on the ground that there had been an implicit acquittal by a verdict rendered by the first jury on a related charge, Green v. United States, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). On the other hand, the discretion of the trial court to declare a mistrial has been upheld where the record showed that (1) the first jury could not agree, United States v. Perez, supra; Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (1892); Keerl v. Montana, 213 U.S. 135, 29 S.Ct. 469, 53 L.Ed. 734 (1909); (2) one of the jurors was found to be biased against a party after the commencement of trial, Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed. 974 (1949); (3) there was misconduct or anticipated misconduct by the prosecutor at the first trial, Gori v. United States, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961), or by defense counsel, Arizona v. Washington, supra, which would render the first trial unfair; or (4) a fatal defect in the indictment would in any event require that a conviction be set aside, Illinois v. Somerville, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973).
 
 
 18
 Turning to the present case, our task as a reviewing court is to determine first, whether the basis for the trial judge's mistrial order in this case, which includes no explicit finding of manifest necessity, is adequately disclosed by the record; and secondly, we must determine whether the trial judge's exercise of his discretion was sound. It is undisputed that jeopardy had attached once the jury was sworn and testimony was taken. Although a short trial was anticipated, a key witness, Mrs. Downer, had testified at length under both direct and cross-examination. It is further beyond question that the defendant objected vigorously and repeatedly to the declaration of a mistrial, both before and after it was declared, expressly asserting his rights under the Double Jeopardy Clause and offering to waive his presence or to consent to a 7 to 10-day continuance until his anticipated return from hospitalization.
 
 
 19
 Neither the record nor the parties suggest any reason why the continuance proposal, with the jurors free to return home until resumption of trial, would not have been a feasible and practical solution to the problem. There is no evidence that the jury would thereby have been exposed to prejudicial publicity. Indeed, the record is silent as to whether the case received any publicity at all. The unlikelihood of prejudicial publicity would not be surprising, since Dunkerley conceded that he had killed his stepfather, and none of the persons or witnesses involved appear to have been public figures. The sole issue remaining to be tried was a narrow one, whether Dunkerley possessed at the time of the homicide the requisite mental capacity.
 
 
 20
 Unlike the situation in Arizona v. Washington, supra, where the prosecutor repeatedly moved for and vigorously urged a mistrial based on defense counsel's prejudicial statements to the jury, the State here did not object to a 7 to 10-day continuance and did not seek a mistrial. Nor did it, faced with the burden of proving "manifest necessity" in view of Dunkerley's objections, offer evidence of any other factors militating against the continuance proposal, such as Vermont legal prohibitions, or proof that because of other commitments a 7 to 10-day continuance would work an undue hardship upon court, jury, counsel or the prosecutor. Indeed, the practice of granting such continuances because of unexpected developments during the course of a jury trial is commonplace in many jurisdictions.
 
 
 21
 Nor did the trial judge, in declaring a mistrial, suggest that the alternative of a short continuance would be unfeasible, unfair to the parties, violative of any state law or practice, or unreasonable under the circumstances.[6] Judge Valente merely stated, after taking a short period to consider the alternatives proposed by the parties, that he was declaring a mistrial in fairness to the defendant. We recognize that where the record discloses plausible reasons supporting the declaration of a mistrial the trial judge may not be required to state his reasons. Arizona v. Washington,---- U.S. at ----, 98 S.Ct. at 834. However, we "have an obligation to satisfy (ourselves) that, in the words of Mr. Justice Story, the trial judge exercised 'sound discretion' in declaring a mistrial." Id.
 
 
 22
 We do not suggest that the trial judge in this case acted impetuously. Cf. United States v. Jorn, 400 U.S. 458, 91 S.Ct. 547, 27 L.Ed.2d 543 (1973). When the problem of petitioner's illness arose, he conferred with counsel and gave each a fair opportunity to explain his situation with regard to how the trial should proceed. But the apparent availability of at least one alternative to a mistrial adjourning the trial for 7 to 10 days leads us to conclude that a mistrial was not a "manifest necessity." In the absence of any record evidence or statement by the court indicating why a short continuance would have been unreasonable, unfair, or impractical, we decline to speculate as to factors that the trial judge might possibly have considered, such as the "freshness" of the evidence. On this record the declaration of a mistrial cannot properly be sustained, over appellant's objection, as having been required by a "high degree" of necessity.[7]
 
 
 23
 We reverse and direct that the writ issue.
 
 MOORE, Circuit Judge (dissenting):
 
 24
 The majority today holds that a state trial judge abused his discretion when he halted the trial of a murder defendant whose sudden illness required a lengthy period of hospitalization. I believe that the situation could properly have been found to constitute such "manifest necessity" as is required by the Constitution to permit a retrial, and I accordingly dissent from my colleagues' substitution of their after-the-fact judgment for that which was responsibly exercised by the trial judge.
 
 
 25
 In reaching my conclusion that the Double Jeopardy Clause does not bar a retrial in this case, I start with the proposition that has remained basic to this area for over 150 years, ever since it was first applied in United States v. Perez, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824):
 
 
 26
 "(I)n all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office."
 
 
 27
 This "discretionary" standard has remained the governing standard to this day, as is evident from the Supreme Court's recent opinion in Arizona v. Washington, --- U.S. ----, ----, 98 S.Ct. 824, 834, 54 L.Ed.2d 717 (1978), which emphasized that a trial judge's determination to grant a mistrial "is entitled to special respect", Id. at ----, 98 S.Ct. 883, and to which the majority paid no heed in deciding as it did. In Washington, a mistrial had been declared without a statement of reasons and over the defendants' objections because defense counsel had interjected improper comment in his opening address. The Supreme Court held that a retrial should be permitted despite the fact that "some trial judges might have proceeded with the trial after giving the jury appropriate cautionary instructions" instead of having halted the trial. Id. The Court quite candidly acknowledged that "(i)n a strict, literal sense, the mistrial was not 'necessary.' " Id. Yet, the majority could not say that the trial judge's decision to abort the trial constituted such an unsound exercise of discretion as to preclude a new trial and, indeed, the Court suggested, See id., that the application of something less than the "strictest" of "scrutiny" was appropriate in a case where the mistrial ruling was predicated neither on the state's misconduct nor any charge of careless preparation on its part when the potential for harassment, the major consideration underlying the double jeopardy protection, See Green v. United States, 355 U.S. 184, 187-88, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957), is simply not involved.
 
 
 28
 The same standard of deference applied in Washington is appropriate in this case. No one has even suggested an improper motive on the part of the prosecutor in this case. Rather, the precipitating disruptive factor necessitating a mistrial was the defendant's illness which, unfortunate as it was, was in no way chargeable to the state. Nowhere was the state's preparedness challenged; yet, its interest in having "one complete opportunity to convict", Arizona v. Washington, supra, 98 S.Ct. at 832, has now been compromised by my colleagues in the majority, only because of their disagreement with the alternative chosen by the trial judge.
 
 
 29
 Nor was the trial judge's conduct in this case "erratic" or precipitous the factor tipping the scales in United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1970), as was emphasized in both Illinois v. Somerville, 410 U.S. 458, 469, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973), and, more recently, in the Washington case itself, 98 S.Ct. at 835. Rather, in this case, the trial judge solicited alternatives, considered them, and rejected them as inadequate.
 
 
 30
 The majority rules, however, that because the record is silent as to prejudicial publicity, and because no statement of reasons was given for rejecting the proposal for a continuance pending the defendant's hospitalization (with the concomitant de-sequestration of the jury during the hiatus), the judge committed error in failing to adopt that alternative in this case. As to the lack of a statement of reasons, the majority concedes (see majority opinion, Ante at page 147) that Washington has made it clear that no reasons need be stated on the record, 98 S.Ct. at 835, as long as plausible reasons exist in support of the mistrial ruling. I am satisfied that the judge acted well within proper bounds in ruling as he did.
 
 
 31
 First, his decision rejecting de-sequestration as an alternative was entirely consistent with Vermont practice, under which sequestration is generally favored in All serious criminal cases. See State v. Anderson, 119 Vt. 355, 125 A.2d 827, 830-31 (1956); State v. White, 129 Vt. 220, 223, 274 A.2d 690, 694 (1971). In a state which favors sequestration, such procedure would seem to be an appropriate prophylactic safeguard to prevent extra-evidentiary information from prejudicing the verdict. It is no answer to the trial judge in This case that in fact there was no likelihood of publicity, for the seriousness of the crime itself suggested that precautions must be taken. Therefore, I vigorously dissent from the majority which holds that the action of the trial judge, in adherence to the common understandings of criminal practice in his state, was "abusive" as a matter of federal constitutional law.
 
 
 32
 Even if, in an exercise of prescience, the trial judge should have foreseen that de-sequestration would pose no problems because, as the majority points out, publicity was not "likely", nonetheless the judge's rejection of the continuance alternative was sound and justifiable. In fact, Judge Valente's concerns in rejecting the proposal were quite adequately indicated on the record. After the judge solicited suggestions from counsel and ascertained defendant's condition, he reported to counsel that the defendant's treating physician had confirmed the prognosis that Dunkerley "should be confined 7 to 10 days. If he gets worse of course he will be there a lot longer." The judge then explained:
 
 
 33
 "I want to state upon the record that although the Court realizes this is a very serious case . . . it will not be a very lengthy case when it is ultimately tried so that is one of the considerations that the Court had in mind in declaring a mistrial. That in order to insure a fair trial for the defendant here, that the Court felt in the interest of justice that a mistrial should be declared. The Court further finds of course that it wasn't any voluntary absence here." (Joint Appendix at 20).
 
 
 34
 While the majority does not seriously dispute the "voluntary absence" issue, a matter essentially requiring interpretation of Vermont law, it finds nothing in the judge's statement, nor on the record as a whole, to support the judge's refusal to grant a continuance. However, the judge's concerns were voiced only after defense counsel had argued that no prejudice would result as a consequence of the probable 7 to 10 day hiatus "between the taking of evidence". (Joint Appendix at 19). It seems to me quite obvious that it could create no small concern that, at a minimum, a 7 to 10 day hiatus would intervene between the "taking of evidence" in a murder case such as this. Potentially, each juror could be required to wait even longer than 10 days before being permitted to consider the evidence already given by defendant's main witness and to weigh it against the fresher evidence to be offered by experts, as well as by the defendant himself, after his return. Any continuance would raise a potential that the jurors' reactions to the earlier evidence would be tempered by other, extra-evidentiary considerations; in a serious murder case such as this, where the length of the hiatus exceeds the length of the trial, the trial judge, who is in the best position to evaluate the abilities of the particular jurors to pay heed to the evidence alone, should be permitted to exercise all the procedural control he thinks necessary to promote a just judgment.
 
 
 35
 In concluding that the trial judge's conduct of this case was unsupportable under the law of double jeopardy, the majority has effectively created a constitutionally mandated rule that a state trial judge Must grant a continuance if requested by a stricken defendant because his right to proceed with the jury of his choice is paramount. I am mindful of the importance to a defendant of his right to proceed with the jury he has preferred, but it is a right that has never been thought absolute. Indeed, it has been held no bar to retrial in cases, including one in our own circuit, where a mistrial had been declared due to the mid-trial illness or incapacity of a juror in the case. The judge may discharge the jury even if the defendant desires to proceed with only the eleven remaining jurors from his chosen panel, and even if the state consents. See Parker v. United States, 507 F.2d 587 (8th Cir. 1974), Cert. denied, 421 U.S. 916, 95 S.Ct. 1576, 43 L.Ed.2d 782 (1975); United States v. Potash, 118 F.2d 54, 56 (2d Cir.), Cert. denied, 313 U.S. 584, 61 S.Ct. 1103, 85 L.Ed. 1540 (1941) (trial judge has discretion under Perez ); Gardes v. United States, 87 F. 172, 177 (5th Cir.), Cert. denied, 171 U.S. 689, 19 S.Ct. 884, 43 L.Ed. 1179 (1898). The Perez discretionary standard was invoked in support of all these trial decisions to discharge the panel and begin anew, as it was cited to support retrial in cases where the defendant had become incapacitated or ill, as in this case. Featherston v. Mitchell, 418 F.2d 582 (5th Cir. 1969), Cert. denied, 397 U.S. 937, 90 S.Ct. 945, 25 L.Ed.2d 117 (1970); United States v. Stein, 140 F.Supp. 761 (S.D.N.Y.1956) (Perez and Potash cited). See also, Annot., 159 A.L.R. 750.
 
 
 36
 The majority's new "rule", though, would seemingly require that a continuance be granted for any illness, even if the trial judge himself were to fall ill, since the defendant would be deprived of his right to proceed with the first jury were a new trial to be ordered. However, the Vermont Rules of Criminal Procedure themselves suggest that the sudden disability of a judge would create a "manifest necessity" for a mistrial ruling. The Reporter's Notes to Rule 25 explain that no provision has been made for substituting another judge in the event of disability during a criminal trial because under Vermont practice it is unlikely that there will be many trials of sufficient length to require such provision. The Reporter then suggests:
 
 
 37
 "A mistrial is the proper remedy for disability occurring during trial. Presumably, a mistrial in such circumstances does not bar reprosecution because the 'manifest necessity' recognized as permitting retrial after jeopardy has attached would be found. See United States v. Perez, . . .; Illinois v. Somerville . . . ." (V.R.Cr.P. 25, Vt.Stat.Ann. (1974)).
 
 
 38
 Whether it is the judge, a juror, or the defendant himself who suddenly falls ill, the trial has been disrupted severely, and itself has been jeopardized, much the same as if prejudicial comment has been injected into the proceedings. A judge must then pick up the pieces of the proceedings, and must choose the most appropriate course to assure fair proceedings; he is in a unique situation a situation not shared by my colleagues who face only a cold written record. I think it well within a trial judge's sound discretion to decide to begin anew under such circumstances; his decision must be upheld as long as it rests on sound rules of state practice and conscientious deliberation. As the Court said in Illinois v. Somerville, 410 U.S. at 468, 93 S.Ct. at 1072:
 
 
 39
 "We believe that in light of the State's established rules of criminal procedure, the trial judge's declaration of a mistrial was not an abuse of discretion. Since this Court's decision in Benton v. Maryland, . . . federal courts will be confronted with such claims that arise in large measure from the often diverse procedural rules existing in the 50 States. Federal courts should not be quick to conclude that simply because a state procedure does not conform to the . . . federal . . . rule, it does not serve a legitimate state policy."
 
 
 40
 In Arizona v. Washington, the Supreme Court declared that the "overriding interest in the evenhanded administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation" of the particular problem which threatens the proceedings, and that we refrain from second-guessing a trial ruling made after rational consideration of the alternatives. Washington itself permitted retrial even though the Court acknowledged that a different trial judge may have chosen a different course, perhaps to "cure" the prejudicial statements by cautionary instructions. Deference, however, was paid to the trial judge's ability to assess the jurors' reactions to the proceedings and his responsible conduct in acting as he did. Though in a "strict . . . sense, the mistrial was not 'necessary' " in Washington, 98 S.Ct. at 834, the necessity was sufficiently manifested so that the Constitution would not be offended were a retrial to proceed.
 
 
 41
 The situation is not different in this case. The serious illness of the defendant caused an emergency situation requiring a sound decision as to the proper course to pursue. The trial judge acted with the motivation to ensure that the defendant and the state would have a fair trial, and his rulings conformed with standards of practice long established in his state. To hold that such conduct is an abuse of discretion is not only to ignore the teachings of the Perez case, which has been the governing standard since 1824, and which has formed the basis for many holdings supporting discretionary mistrials in this circuit and elsewhere, but it is also contrary to the Supreme Court's latest holding in Washington that discretion, especially that of judges of the various states, is to be respected when honestly and soundly exercised.
 
 
 42
 By their decision the majority creates a federal-appellate-judge-made-rule of trial procedure having little regard for the exigencies of the trial. The majority's position in my opinion is at odds with the law and a usurpation of the powers vested in the trial judges of the various states. I therefore dissent.
 
 
 
 [1]
 Appellant was returned to prison after 10 days of hospitalization. As Judge Coffrin later observed, "There is no indication that the disability was in any way induced by petitioner."
 
 
 [2]
 Rule 43(b)(1) of the Vt.Rules of Crim.Procedure in pertinent part provides:
 "(b) Continued Presence Not Required. The further progress of the trial to and including the return of the verdict shall not be prevented whenever a defendant, initially present,
 "(1) in noncapital cases, voluntarily absents himself after the trial has commenced, whether or not he has been informed by the court of his obligation to remain during the trial."
 Although Dunkerley was charged with first degree murder, this is a noncapital crime in Vermont, the punishment for which is life imprisonment. 13 Vt.Stat.Ann. § 2303.
 
 
 [3]
 This statement was clearly erroneous. Upon the improper Sua sponte declaration of a mistrial by the trial judge, retrial is precluded by the Double Jeopardy Clause, United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971)
 
 
 [4]
 The double jeopardy provision of the Fifth Amendment, which provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb" applies to the states through the Due Process Clause of the Fourteenth Amendment. Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969)
 
 
 [5]
 In United States v. Grasso, 552 F.2d 46 (2d Cir. 1977), we held that "before a trial judge declares a mistrial, he must make explicit findings, preferably after a hearing, that there are no reasonable alternatives to mistrial." Id. at 52. The Supreme Court's decision in Arizona v. Washington, --- U.S. ----, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978), indicates that at least with respect to a state defendant seeking federal habeas, a "state trial judge's mistrial declaration is not subject to attack . . . simply because he failed to find 'manifest necessity' in those words or to articulate on the record all the factors which informed the deliberate exercise of his discretion." Id., 98 S.Ct. at 836 (footnote omitted). Where "the record provides sufficient justification for the state court ruling, the failure to explain that ruling more completely does not render it constitutionally defective."
 
 
 [6]
 Judge Moore's dissent speculates that the trial judge may have opted for a mistrial rather than a continuance (which would have entailed de-sequestration of the jury) because sequestration is "generally favored in All serious criminal cases" in Vermont. Infra, p. 149. However, no Vermont statute or rule of practice prevented the trial judge in this case from de-sequestering the jury. Nor did the Vermont Supreme Court, possessed as it is of expertise in Vermont law, suggest that the trial judge's action could be justified on such a basis
 On the contrary, it has stated that the "propriety of separation of juries in any given situation is not a matter specifically dealt with by our statutes. The governing rules have derived from practices developed by our courts over their long history." State v. Brisson, 124 Vt. 211, 201 A.2d 881, 882 (1964).
 The "governing rule" in a noncapital case such as this one would have prevented de-sequestration of the jury only if the defendant objected. State v. Anderson, 119 Vt. 355, 125 A.2d 827, 831 (1956), cited with approval in State v. Brisson, supra, 201 A.2d at 883. The record clearly shows that Dunkerley's counsel actually opposed sequestration of the jury from the outset of the trial. (Joint App. 7-9). The record also shows that neither party, nor the court, considered that any legal prohibition stood in the way of de-sequestration when that alternative was proposed by the defense. Therefore, de-sequestration was a course of action entirely available to the trial judge, and not an alternative that was either disfavored, or of questionable validity, because of Vermont law or practice.
 
 
 [7]
 We disagree with our dissenting colleague's characterization of the holding of this case. We do not decide that it is an abuse of discretion for a trial judge to declare a mistrial when a defendant's "sudden illness require(s) a lengthy period of hospitalization." No such lengthy period of hospitalization is at issue here. According to the record, the defendant was estimated to be absent for 7-10 days. This prognosis turned out to be correct. What we hold today is that we cannot approve the declaration of a mistrial when the record does not indicate that the mistrial was manifestly necessary, in light of the relatively brief interruption in the trial caused by the defendant's illness, and the availability of another alternative to the mistrial declaration
 Although we do not reach the question of whether or under what circumstances it would be proper for a trial judge to declare a mistrial because of a defendant's Lengthy absence, the cases cited by Judge Moore in his dissent indicate some of the circumstances involving a defendant's or juror's incapacity that have necessitated a mistrial. See United States v. Potash, 118 F.2d 54 (2d Cir. 1941) (mistrial declared when juror became incapacitated after deliberations had begun); Gardes v. United States, 87 F. 172 (5th Cir. 1898) (mistrial declared after juror had become totally and permanently disabled); Featherston v. Mitchell, 418 F.2d 582 (5th Cir. 1969) (mistrial declared when trial court became aware that defendant might not be competent to stand trial, and ordered extended hospitalization and psychiatric observation); United States v. Stein, 140 F.Supp. 761 (S.D.N.Y.1956) (one defendant severed from trial when she required "major" operation and 3-4 month convalescence).
 In all of these cases, the declaration of a mistrial was approved because circumstances occurred that rendered continuation of the trial infeasible, i. e., a "manifest necessity" justified aborting the trial. We consider our decision today to be consistent with these cases, as well as the other well-settled precedents applicable to cases of this kind. See pp. 145-147, Supra.