750 F.2d 154
 Basheer HAMEED (f/k/a James Dixon York) and Abdul Majid
(f/k/a Anthony LaBorde), Appellants,
v.
W. Clinton JONES, Superintendent of Great Meadows
Correctional Facility, and Eugene LeFevre,
Superintendent of Clinton Correctional
Facility, Appellees.
 No. 138, Docket 84-2150.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 20, 1984. Decided Nov. 26, 1984.
 
 William M. Kunstler, New York City (Mark B. Gombiner, Randolph M. Scott McLaughlin, C. Vernon Mason, New York City, of counsel), for appellants.
 Ray F. Cerreta, Asst. Dist. Atty., Queens County, Kew Gardens, N.Y. (John J. Santucci, Dist. Atty., Queens County, Kew Gardens, N.Y., of counsel), for appellees.
 Before LUMBARD, OAKES, and PRATT, Circuit Judges.
 OAKES, Circuit Judge:
 This appeal from the district court's denial of appellants' habeas corpus petition presents the familiar question whether a state trial court's declaration of mistrial was prompted by a "manifest necessity" sufficient to render a retrial constitutionally permissible. In this case, however, the familiar is framed in an unfamiliar context. In appellants' criminal trial, after the case had gone to the jury and the jury had received an Allen charge, one of the jurors suffered a psychiatric episode that rendered her unfit for further deliberations. When this occurred, the appellants requested that the trial judge substitute an available alternate juror, pursuant to a state statutory provision suggesting that the court must substitute such an alternate. The court refused appellants' request and instead declared a mistrial.
 Appellants then brought an Article 78 proceeding[1] in the Appellate Division of the Supreme Court of New York, Second Department, seeking a dismissal of their indictments. When that action proved unsuccessful, appellants brought this petition under 28 U.S.C. Sec. 2254 (1982) for a writ of habeas corpus in the United States District Court for the Eastern District of New York. The district court, Judge Thomas C. Platt, found that a "manifest necessity"[2] to declare a mistrial was apparent under the circumstances recounted below, finding hence that the United States Constitution, through the double jeopardy clause of the Fifth Amendment, as incorporated in the Fourteenth Amendment, poses no bar to a retrial of appellants. We affirm.
 In 1982, Basheer Hameed, formerly James Dixon York, and Abdul Majid, formerly Anthony LaBorde, were tried by a jury in the Supreme Court of New York, Queens County, on charges of attempted murder in the second degree, in violation of N.Y. Penal Law Secs. 110.00, 125.25 (McKinney 1975), attempted murder in the first degree, in violation of N.Y. Penal Law Secs. 110.00, 125.27, assault in the first degree, in violation of N.Y. Penal Law Sec. 120.10, and murder in the second degree, in violation of N.Y. Penal Law Sec. 125.25. Both men were convicted of attempted murder in the second degree, but acquitted of attempted murder in the first degree and assault in the first degree. The jury in that trial, however, could not reach a verdict on the charge of murder in the second degree. It is on the retrial of that charge before Justice Cornelius O'Brien that the events set forth below took place.
 
 
 1
 After a lengthy jury selection process and a trial lasting several weeks, the jury retired to deliberate on September 29, 1983, with three alternates separated and sequestered (except for transcript readbacks) but not dismissed. Deliberations continued, punctuated by numerous readbacks, on September 30 and October 1, but not on Sunday, October 2. Before lunch on October 3, the jury announced that it was deadlocked, but the court directed it to continue deliberations. Deliberations took place on October 3, October 4, and October 5, and were again punctuated by numerous readbacks. On October 6, the sixth day of deliberations, at approximately 3:15 p.m., the jury sent a second note to Justice O'Brien, which read, "We, the jury, cannot reach a verdict. We have York, not guilty, eight; guilty, four. LaBorde, not guilty, eight; guilty, four. We are a hung jury. Sincerely, Mrs. Greer."
 
 
 2
 Defense counsel responded to this note by requesting that the judge deliver an Allen charge.[3] The judge granted the request, delivering a standard version of an Allen charge that concluded at 4:20 p.m. that afternoon. Following the Allen charge, counsel for Majid at side bar requested that "the Court follow the practice it followed last night, which is to keep them beyond the usual hour, in, perhaps, the hope that [if] they stay, by eleven tonight, they won't have to come back tomorrow morning." The judge replied, "I intended to stay later on tonight."
 
 
 3
 At about 7:00 p.m., all attorneys were called to a conference in chambers. A juror, "Ms. Jane Doe," had requested that she not have to eat with the rest of the jurors and that she be allowed to contact her psychiatrist. The court also informed the parties that "[h]er husband has been contacted, and I believe that her husband has conveyed to Mr. Kenny [the court clerk] the information that Dr. Vivik has advised that she call him." In the discussion that followed, Hameed's counsel suggested that the court substitute an alternate juror for Ms. Doe, pursuant to People v. Ryan,[4] but the court cautioned:
 
 
 4
 You have to remember that we have had the jury out for all these days, since last Thursday. The jury has been hung for most of that time, until today. There is no guarantee whatsoever that if an alternate replaces Miss [Doe] there is going to be any change.
 
 
 5
 What I would like to do, and I think it's more proper, is to have Miss [Doe] speak to the doctor to determine whether or not the doctor says that she can continue.
 
 
 6
 After the judge indicated his belief that "other jurors" were "having difficulties also," the prosecutor suggested that the court inquire of the jurors whether they wanted to go to dinner (and therefore to continue deliberations) and that if all agreed there was no point to it, everyone's problems would be solved. The judge rejected the suggestion, adding that he had "hop[ed] to go beyond" the mere three hours of deliberation that had occurred following the Allen charge but that he was "not intending to go much beyond tonight." It was then agreed by all concerned that, given certain precautions, the doctor should speak to Ms. Doe while the rest of the jurors ate.
 
 
 7
 After a recess, following instructions to the other jurors not to deliberate during dinner, the judge said in a chamber conference, "I spoke to Miss [Doe]. Miss [Doe], beyond any doubt, is in a state where she is absolutely unfit to continue." He recounted his telephone conversation with her doctor, who advised him that Ms. Doe had suffered a psychotic episode, "a nervous breakdown," the year before. The judge informed the parties that he had then put Ms. Doe on the telephone to her doctor, and evaluated that conversation as follows:
 
 
 8
 She spoke in general terms to coin a phrase, pretty bad shape. I didn't know what she was talking about, except for a few words.
 
 
 9
 She just indicated that it was the same as last year. I just couldn't understand her.
 
 
 10
 When she got off the phone, I asked her to leave the room, and the doctor said that she was on the brink of a psychotic episode, and could not continue.
 
 
 11
 Now, I contacted her husband. He is here. I have spoken to him, and, of course, we have a great concern, that is the press is going to get her name. I have made arrangements that she is to be taken to see the doctor at 9:30, and we are running beyond that.
 
 
 12
 But I am going to call the doctor, and have her call him in a few minutes.
 
 
 13
 I am going to discharge the jury.
 
 
 14
 At this point defense counsel requested, pursuant to N.Y.Crim.Proc.Law Sec. 270.35 (McKinney 1982), that she be replaced with an alternate.[5] Counsel argued vigorously and at some length that the rule of substitution in Sec. 270.35 was mandatory,[6] that the defendants had a real interest in not being subject to yet another trial, and that there had been only two or so hours of deliberation after the Allen charge. The court's response reflects an amalgam of concerns and considerations:
 
 
 15
 I was within a matter of a couple of hours of discharging the jury, in any event, before this unfortunate incident.
 
 
 16
 It came on with extreme suddenness.
 
 
 17
 What occurred is that I believe it was Saturday, she became a little overwrought. But that's common.
 
 
 18
 I paid very little attention to it.
 
 
 19
 If you recall, Miss McCaffrey, at one point, was also crying and probably other jurors.
 
 
 20
 As always happens, that becomes emotional.
 
 
 21
 I had inquired discreetly a couple of times how these people were doing, whether they were showing signs of emotion. I wanted to be sure that everything was all right, because the deliberations were extremely long and they were very odd, in that after Monday, when they said they were hung, and when they really had not done too much deliberations, and I said, really, go back and deliberate. We didn't get a note until this afternoon.
 
 
 22
 What occurred, I suspect strongly, is that when they sent that note indicating they were hung, eight-four, they thought that was going to be the end of it.
 
 
 23
 We started getting an addition to the problem with Miss [Doe]'s personal notes with regard to parents and taking care of checks and medicine and so forth.
 
 
 24
 Miss [Doe] had reached the end of her tether.
 
 
 25
 I am concerned that if I continue, and I was not going to continue past, the latest, eleven o'clock tonight, after giving that Allen charge. If we continue, we may have problems with other jurors.
 
 
 26
 Not Number One and Number Two, I don't know what Miss [Doe]'s position was. I don't know what the position will be of any alternate who would be substituted at this late stage of the proceedings.
 
 
 27
 I think, quite frankly, I will speak very bluntly, that if I were to substitute an alternate at this stage, it would be absolute [sic] absurd, really.
 
 
 28
 And I am not going to do it.
 
 My main concern right now is this:
 
 29
 I have spoken to Miss [Doe]'s husband. I don't want the press to get the name of Miss [Doe].
 
 
 30
 Now, if I substitute an alternate, I would have to release Miss [Doe]. This is just an ancillary reason for my not going along.
 
 
 31
 Further, it would be out very quickly that Miss [Doe] suffered this episode.
 
 
 32
 All right, but it would happen.
 
 
 33
 There is no way I can guard against it.
 
 
 34
 If I substitute an alternate right now, Miss [Doe]'s name would be in the paper tomorrow.
 
 
 35
 Now, what I'm going to do is I'm going to very briefly go outside here and I am going to discharge the jury. I am going to direct that they not speak to the press when they're gone.
 
 
 36
 I'm going to now direct my words to the press, to the audience.
 
 
 37
 I'm going to tell the press the reason why I am directing the jury not to speak to the press, is that one of the jurors has had--I don't want to say a breakdown or something, but she is on the verge, she is within moments of it.
 
 
 38
 But I don't want to say that because I don't want people calling and trying to find out who the problem is with.
 
 
 39
 The next thing is, Miss [Doe], and I spoke to her husband, and he doesn't want this to happen. Nobody in his right mind would want this to happen.
 
 
 40
 Miss [Doe] will have irreparable damage to her mental health, and that's my main concern right now. That's my main concern.
 
 
 41
 Not my only concern. I have a hundred concerns. That's my main concern, my overriding concern.
 
 After more colloquy, the court added:
 
 42
 As I say, I was within a couple of hours of discharging the jury, in any event. To me, it's utterly absurd, seriously, to bring in an alternate who's not deliberated during these last six or seven days, whatever it is, and have that person now join in deliberations.
 
 
 43
 I don't see what purpose would be served.
 
 
 44
 I am playing Russian roulette with some other people on the jury.
 
 
 45
 I have tried to make them fairly comfortable. I don't think that their life has been too comfortable, from what I have heard, they are literally, just ready to burst out of here. They have been inside, perhaps, too long.
 
 
 46
 I am concerned about it. So that's what's going to happen.
 
 
 47
 Subsequently the following colloquies occurred:
 
 
 48
 THE COURT: I am talking not only about that statute, but about my discretion to discharge the jury after all of these lengthy deliberations, in view of the incident that has occurred with regard to Miss [Doe] and in view of all the other circumstances that I must consider when I am going to discharge a jury.
 
 
 49
 I am ruling that it is now time to discharge this jury.
 
 
 50
 MR. SCOTT-McLAUGHLIN: If I may make a suggestion?
 
 
 51
 THE COURT: Yes.
 
 
 52
 MR. SCOTT-McLAUGHLIN: For the sake of the record, one, we at least inquire of the jurors whether or not they feel there is a possibility of a verdict at this point, after the Allen charge.
 
 
 53
 THE COURT: What about Miss [Doe]?
 
 
 54
 What am I going to do with Miss [Doe] now in order to save her embarrassment?
 
 
 55
 ....
 
 
 56
 THE COURT: You mean, I should discharge Miss [Doe], replace her with one of these others?
 
 
 57
 MR. GOMBINER: You should replace her with one of the alternates, first.
 
 
 58
 THE COURT: If they can come to a verdict in an hour and a half?
 
 
 59
 MR. SCOTT-McLAUGHLIN: If they can come to a verdict, if there has been movement.
 
 
 60
 ....
 
 
 61
 THE COURT: You see, we're dealing with two different concepts.
 
 
 62
 One is the right of the defendants to agree to have an alternate substitute. The next is my discretionary or my duty to discharge the jury after lengthy deliberations at the proper time, and I feel, especially in light of this development, that this jury has had enough.
 
 DISCUSSION
 
 63
 Appellants argue that the trial court's refusal to implement N.Y.Crim.Proc. Law Sec. 270.35 or to explore other alternatives deprived them of their "valued right,"[7] to obtain "the verdict of a tribunal [the defendant] might believe to be favorably disposed to his fate."[8] As Justice Harlan has stated:
 
 
 64
 [T]he Perez doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings. See United States v. Perez, 9 Wheat., at 580 [6 L.Ed. 165].
 
 
 65
 The conscious refusal of this Court to channel the exercise of that discretion according to rules based on categories of circumstances, see Wade v. Hunter, 336 U.S., at 691 [69 S.Ct., at 838], reflects the elusive nature of the problem presented by judicial action foreclosing the defendant from going to his jury. But that discretion must still be exercised....[9]
 
 
 66
 Appellants argue that the trial court's declaration of mistrial was in derogation of constitutionally and statutorily mandated procedures. They argue that the trial judge first impermissibly refused to comply with the defendants' express request to implement Sec. 270.35; then stated an impermissible reason for ordering a mistrial (the desire to spare Ms. Doe attention from the press); and finally, only to save his original order, stated post hoc his belief that the jury (which he knew harbored one mentally ill member) would not have been able to reach a verdict.
 
 
 67
 We turn first to the statutory contention. Federal habeas corpus is not, of course, available simply by virtue of a violation of state criminal law. Rogers v. Peck, 199 U.S. 425, 26 S.Ct. 87, 50 L.Ed. 256 (1905); Chance v. Garrison, 537 F.2d 1212 (4th Cir.1976). We take it, therefore, that appellants' statutory argument is an aspect of its constitutional argument that the trial court violated the double jeopardy clause in ordering the mistrial, because a "manifest necessity" to declare a mistrial could not exist where the trial court failed to implement a statute requiring the substitution of an alternate juror in these circumstances. Although the State does not advance the point, we believe that the trial court properly determined that N.Y.Crim.Proc. Law Sec. 270.35 was not intended to limit a trial court's discretion to declare a mistrial under N.Y.Crim.Proc. Law Sec. 280.10[10] and Sec. 310.60.[11] Indeed, in a memorandum opinion denying appellants' Article 78 petition to dismiss the indictment the Appellate Division said:
 
 
 68
 Notwithstanding the fact that the trial court had delivered an Allen charge (Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528) three hours prior to its declaration of a mistrial, it was not bound to substitute an available alternate, pursuant to CPL 270.35, when one juror was unable to continue deliberations. Because the jury had been deliberating for seven days and had twice declared itself deadlocked (first on the fourth day of deliberations and again on the seventh day of deliberations), the court could have concluded that agreement on a verdict was unlikely within a reasonable time and thus properly declared a mistrial in accordance with CPL 310.60. The Trial Judge was "best situated intelligently to make such a decision" (Gori v. United States, 367 U.S. 364, 368, 81 S.Ct. 1523, 1526, 6 L.Ed.2d 901) and, under all the relevant facts and circumstances, we find that he exercised his discretion properly and that retrial will not deprive petitioners of any constitutional right [citations omitted].
 
 
 69
 Hameed v. Rotker, 99 A.D.2d 824, 824, 472 N.Y.S.2d 417, 417 (1984), leave to appeal denied Mar. 29, 1984. Although petitioners suggest otherwise, the Appellate Division's finding that the trial court had properly exercised its discretion was not fashioned out of whole cloth. One need only refer to the statements made by the trial judge particularly toward the end of the colloquies, quoted above, which occurred at around 9:30 p.m. on the evening of October 6. These statements reflect a trial judge acting with prudence in the exercise of his "discretion to discharge the jury after all of these lengthy deliberations, in view of the incident that has occurred with regard to Miss [Doe] and in view of all the other circumstances that I must consider when I am going to discharge a jury" (emphasis added).
 
 
 70
 Having determined that under the circumstances of this case, N.Y.Crim.Proc. Law Sec. 270.35 did not require the trial court to substitute an alternate juror when Ms. Doe became indisposed, we may now squarely address the constitutional issue before us--did the trial court have constitutionally sufficient grounds for having declared appellants' trial a mistrial?
 
 
 71
 As an initial matter, we must bear in mind the injunction of Arizona v. Washington, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978), that a trial judge's determination or perceptions must be given "great deference," id. at 510, 98 S.Ct. at 832, and that "necessity" is not to be taken literally, id. at 511, 98 S.Ct. at 833 ("In a strict, literal sense, the mistrial was not 'necessary.' "). Our duty is to be sure that the trial judge exercised " 'sound discretion' in declaring a mistrial." Id. at 514, 98 S.Ct. at 834, accord United States v. Grasso, 600 F.2d 342, 344 & n.6 (2d Cir.1979).
 
 
 72
 We believe the exercise of the judge's discretion was "sound" under all the circumstances, which include the increasingly apparent strain and tension placed on the sequestered jury by the lengthy deliberations, the highly charged atmosphere of the case,[12] and the remote likelihood that even a jury untroubled by Ms. Doe's illness would have reached a verdict by the end of the evening. Accordingly, we do not find improper the trial judge's determination that putting an alternate on the jury at this late stage would have been "absurd." Indeed, it is the "national consensus of bench and bar" that the substitution of alternates after deliberations have commenced should not be permitted, United States v. Viserto, 596 F.2d 531, 540 (2d Cir.1979); and the Federal Rules implement that consensus, Fed.R.Crim.P. 24(c); see Orfeld, Trial Jurors in Federal Criminal Cases, 29 F.R.D. 43, 46 (1962). This is because an alternate juror who enters the jury room after deliberations have begun has missed the discussion and consideration that have previously taken place which make up the deliberative process. See People v. Ryan, supra.
 
 
 73
 It is true that the trial judge said that Ms. Doe's mental health was his "main concern," and that he declined to inquire of the other jurors whether or not they felt there was a possibility of a verdict apparently out of concern for embarrassment to Ms. Doe. We view those words in context, however. The judge was rightly sensitive about embarrassing a person (or her family) who was in the middle or on the verge of a psychiatric episode.[13] He was careful, however, to state his view that other considerations compelled the declaration of a mistrial; he cannot be held to a punctilious choice of language while simultaneously dealing with the problem of whether to declare a mistrial and the mechanics of handling a juror's having a psychiatric breakdown, surely a trying experience for one and all.
 
 
 74
 Of course, appellants rightfully call our attention to the fact that a trial judge's discretion to declare a mistrial is far from boundless, cf. Dunkerley v. Hogan, 579 F.2d 141, 148 (2d Cir.1978) (mistrial wrongly declared where seven- to ten-day continuance could have been granted to avoid declaring mistrial after defendant became ill); United States v. Starling, 571 F.2d 934 (5th Cir.1978) (mistrial wrongly declared where information of possible juror bias discovered--no irreconcilable conflict expressly professed by jury, and trial judge fails to query jury on possibility of reaching verdict); and that a declaration of mistrial stemming solely from a concern for the interests of a juror might exceed these bounds. We do not think, however, that a review of the record on the whole should be discarded in favor of fixing only upon the point in time where the trial judge seemingly first declared a mistrial because of his concern about Ms. Doe. Rather, we are entitled to the benefit of his subsequent elucidating comments, because while the trial judge permitted the lawyers to argue their points he was in effect reserving the right to change his mind. This happens every day in the courtroom or in chambers colloquy.
 
 
 75
 Appellants also object to the court's failure to inquire of the other jurors concerning whether they felt a verdict was obtainable. While making such an inquiry surely would have been the better practice, the jury had already sent in two notes indicating that they could not agree and had received an Allen charge and conducted two hours or so of post-Allen deliberations. Justice O'Brien had previously stated his belief that the evening of October 6, 1983, was to be the last of the trial. When, during that evening, Justice O'Brien confronted Ms. Doe's psychiatric problem and with it his option to substitute an alternate at the eleventh hour of deliberations, we think that he acted soundly in throwing in the judicial towel. In short, he was acting not by inclination but with judgment, see United States v. Burr, 25 Fed.Cas. 30, 35 (C.C.D.Va.1807) (No. 14,692d); and so long as that judgment is guided by appropriate legal premises and is factually well informed, it may rightly be called a sound exercise of discretion. See Friendly, Indiscretion About Discretion, 31 Emory L.J. 747, 784 (1982).
 
 
 76
 Judgment affirmed.
 
 LUMBARD, Circuit Judge, concurring:
 
 77
 Justice O'Brien of the New York Supreme Court granted a mistrial at the second trial of Basheer Hameed and Abdul Majid, two black Muslims, for the murder of a white police officer in Queens County on April 16, 1981. The defendants were originally tried, in August 1982, on an indictment charging them with murdering one police officer and attempting to murder another. The jury convicted the defendants of attempted murder but they failed to agree on the murder charge.
 
 
 78
 At the second trial, held in the summer of 1983, the jury had already deliberated for seven days and had twice reported their inability to reach a verdict when Justice O'Brien declared the mistrial. Also on the seventh day of deliberations, one of the jurors was found to be suffering emotional problems. Justice O'Brien declined to replace the troubled juror with one of the alternate jurors who was still available, as he might have done under New York Crim.Prac.Law Sec. 270.35. Instead, believing that the jury would remain deadlocked regardless of a substitution, he ordered a mistrial.
 
 
 79
 In an attempt to avoid a third trial on the murder charge, Hameed and Majid then sought the aid of the Eastern District Court by petitioning for habeas corpus, claiming that the state court's grant of a mistrial violated the constitutional prohibition against double jeopardy. Judge Platt denied the petition because he found that the declaration of a mistrial was a proper exercise of discretion. I agree.
 
 
 80
 There was every good reason to grant a mistrial on the seventh day of disagreement. The fact that one of the jurors was in a highly emotional state simply underscored the fact that their further consideration of the case would have been futile; it was an additional reason to declare a mistrial.
 
 
 81
 Consequently, I see no reason for this court to consider whether an alternate juror should or might have been substituted pursuant to New York law. I see much less reason for any of us to state his own ideas on what is thought to be the "national consensus of bench and bar" about the use of alternate jurors after the jury has commenced deliberating. In this day, with longer and more expensive trials in multi-defendant cases, fair expedients to avoid the necessity of retrying such cases should be used. I think there is much to be said for the use of alternate jurors at any time they may be needed prior to agreement upon a verdict.
 
 
 
 [1]
 See N.Y.Civ.Prac.Law Secs. 7801-7806 (McKinney 1981)
 
 
 [2]
 See United States v. Perez, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824)
 
 
 [3]
 See Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896)
 
 
 [4]
 People v. Ryan 19 N.Y.2d 100, 278 N.Y.S.2d 199, 224 N.E.2d 710 (1966)
 
 
 [5]
 N.Y.Crim.Proc.Law Sec. 270.35 provides:
 If at any time after the trial jury has been sworn and before the rendition of its verdict, a juror is unable to continue serving by reason of illness or other incapacity, or for any other reason is unavailable for continued service, or the court finds, from facts unknown at the time of the selection of the jury, that a juror is grossly unqualified to serve in the case or has engaged in misconduct of a substantial nature but not warranting the declaration of a mistrial the court must discharge such juror. If an alternate juror or jurors are available for service, the court must order that the discharged juror be replaced by the alternate juror whose name was first drawn and called, provided, however, that if the trial jury has begun its deliberations, the defendant must consent to such replacement. Such consent must be in writing and must be signed by the defendant in person in open court in the presence of the court. If no alternate juror is available, the court must declare a mistrial pursuant to subdivision three of section 280.10.
 
 
 [6]
 Counsel suggested that the court in Ryan said that if the defendant agrees in writing to waive his objection to an alternate juror being seated, he then has a "right" to have this done. We fail to see the language in Ryan to which counsel referred. The statute, however, does say "must."
 
 
 [7]
 See Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949)
 
 
 [8]
 See United States v. Jorn, 400 U.S. 470, 486, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971)
 
 
 [9]
 Id. at 485, 91 S.Ct. at 557
 
 
 [10]
 Sec. 280.10 Motion for mistrial
 At any time during the trial, the court must declare a mistrial and order a new trial of the indictment under the following circumstances:
 
 
 [1]
 Upon motion of the defendant, when there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, which is prejudicial to the defendant and deprives him of a fair trial. When such an error, defect or conduct occurs during a joint trial of two or more defendants and a mistrial motion is made by one or more but not by all, the court must declare a mistrial only as to the defendant or defendants making or joining in the motion, and the trial of the other defendant or defendants must proceed;
 
 
 [2]
 Upon motion of the people, when there occurs during the trial, either inside or outside the courtroom, gross misconduct by the defendant or some person acting on his behalf, or by a juror, resulting in substantial and irreparable prejudice to the people's case. When such misconduct occurs during a joint trial of two or more defendants, and when the court is satisfied that it did not result in substantial prejudice to the people's case as against a particular defendant and that such defendant was in no way responsible for the misconduct, it may not declare a mistrial with respect to such defendant but must proceed with the trial as to him;
 
 
 [3]
 Upon motion of either party or upon the court's own motion, when it is physically impossible to proceed with the trial in conformity with law
 
 
 [11]
 N.Y.Crim.Proc.Law Sec. 310.60 provides in part:
 
 
 [1]
 A deliberating jury may be discharged by the court without having rendered a verdict only when:
 (a) The jury has deliberated for an extensive period of time without agreeing upon a verdict with respect to any of the charges submitted and the court is satisfied that any such agreement is unlikely within a reasonable time; or
 (b) The court, the defendant and the people all consent to such discharge; or
 (c) A mistrial is declared pursuant to section 280.10.
 
 
 [12]
 The inflammatory nature of this case is perhaps best reflected in appellants' description of the proceedings we now review as "the second trial of two Black radicals charged with the assassination of a white police officer. The racial, political and emotional tensions surrounding such a trial are without parallel."
 
 
 [13]
 Cf. People v. Prisco, 37 A.D.2d 369, 326 N.Y.S.2d 65 (1971), aff'd, 30 N.Y.2d 808, 334 N.Y.S.2d 905, 286 N.E.2d 279, cert. denied, 409 U.S. 1039, 93 S.Ct. 520, 34 L.Ed.2d 488 (1972) (where juror becomes ill after jury deliberations commence, court's first duty is to secure medical assistance notwithstanding statutory provision prohibiting jurors from speaking with non-jurors)